**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARY SCHENAULT, | ) | CASE NO. 5:17-cv-2336 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| *Acting Comm'r of Soc. Sec.*, | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Mary Schenault (hereinafter "Plaintiff"), challenges the final decision of

Defendant Nancy A. Berryhill, Acting Commissioner of Social Security (hereinafter

"Commissioner"), denying her applications for a Period of Disability ("POD"), Disability

Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI

of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act"). This court has

jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States

Magistrate Judge pursuant to consent of the parties. (R.13). For the reasons set forth below, the

Commissioner's final decision is REVERSED and REMANDED for proceedings consistent with

this opinion.

# I. Procedural History

On February 10, 2014, Plaintiff filed her applications for POD, DIB, and SSI, alleging a disability onset date of December 6, 2013. (Transcript ("Tr.") 219-227). The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 104-181). Plaintiff participated in the hearing on March 23, 2016, was represented by counsel, and testified. (Tr. 42-75). A vocational expert ("VE") also participated and testified. *Id*. On August 8, 2016, the ALJ found Plaintiff not disabled. (Tr. 35). On July 5, 2017, the Appeals Council denied Plaintiff's request to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-4). Plaintiff's complaint challenges the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 15, 16 & 17).

Plaintiff asserts the following assignments of error: (1) the ALJ failed to give valid reasons for rejecting the opinions of a treating physician, (2) the ALJ did not properly evaluate the claimant's credibility, and (3) the ALJ failed to meet his burden at Step Five of the sequential evaluation. (R. 15).

## II. Evidence

### A. Relevant Medical Evidence[1]

#### 1. Treatment Records

On July 17, 2013, Plaintiff established primary care with Frank D. Lazzerini, M.D., and

---

[1]  The recitation of the evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties in their briefs and also deemed relevant by the court to the assignments of error raised. Because Plaintiff's mental impairments are not directly implicated by Plaintiff's assignments of error, the court omits any recitation of medical records related to those impairments.

complained of pain in her shoulders and back. (Tr. 452). She worked for Autozone and performed a lot of heavy lifting. *Id*. She rated her pain as 10/10, indicating it interfered with her daily activities and sleep. *Id*. She denied frequent urination, diarrhea or headaches. *Id*. She smoked 6 to 10 cigarettes a day. *Id*. Upon examination, Plaintiff had pain and tenderness with spasm and guarding in her cervical, thoracic and lumbar spine, and limited range of motion ("ROM") due to pain. (Tr. 453). There was pain and tenderness in multiple joints bilaterally. *Id*. She had normal motor strength in the upper and lower extremities and intact sensation. *Id*. Dr. Lazzerini assessed degenerative disc disease, osteoarthritis involving more than one site, malaise, and fatigue. *Id*. He prescribed Ibuprofen, Flexeril, and Percocet. *Id*.

On July 19, 2013, x-rays of Plaintiff's cervical spine revealed mild to moderate degenerative changes (Tr. 341). X-rays of the thoracic spine revealed no acute findings. X-rays of the lumbar spine revealed Grade I spondylolisthesis at L5-S1, bilateral pars fractures, and mild disc space narrowing at L4-L5 and L5-S1. *Id*.

On the same date, x-rays of Plaintiffs' hips showed mild symmetric degenerative changes and inflammatory changes. (Tr. 344). X-rays of her knees showed mild degenerative changes. (Tr. 345). X-rays of her shoulders revealed no acute findings. (Tr. 347).

Plaintiff returned to Dr. Lazzerini in August, September, October, and November of 2013. (Tr. 440-449). She consistently reported back pain. *Id*.

On December 9, 2013, Plaintiff returned to see Dr. Lazzerini with complaints of back pain and incontinence. (Tr. 438). She reported back pain radiating down bilaterally to her hips and legs, and trouble walking, but denied musculoskeletal weakness, difficulty urinating, or frequent urination. *Id*. Dr. Lazzerini sent Plaintiff to the ER for evaluation of her bowel and bladder incontinence. (Tr. 439). He gave Plaintiff an off work slip and referred her to pain

management and physical therapy. *Id.*

At the ER, Plaintiff complained of back pain and loss of bowel and bladder control. (Tr. 322). She rated her pain 10/10 (Tr. 327). Upon examination, Plaintiff had mild lumbar midline tenderness, intact sensation, 4/5 strength in her lower extremities, and no edema. (Tr. 322). An MRI scan showed disc bulges, mild spinal canal stenosis, and foraminal encroachment at L4-5 and L5-S1, but no acute evidence of spinal cord impingement (Tr. 322, 329-330, 339, 386-387). A urinalysis was negative, and the etiology of her incontinence was uncertain. (Tr. 322, 331-332).

On December 19, 2013, Plaintiff followed up with Dr. Lazzerini asking for a referral to a neurosurgeon. (Tr. 436). She reported frequent urination, painful joint, and musculoskeletal weakness. *Id.* Upon examination, Plaintiff had normal motor strength, intact sensation, and tenderness to palpation of the lumbar-sacral spine. (Tr. 437). He diagnosed degeneration of lumbar or lumbosacral intervertebral disc, lumbago, sciatica, and unspecified backache. *Id.*

On January 2, 2014, Plaintiff presented for follow up and reported her pain was the same if not worse, which she rated 10/10. (Tr. 433). She did, however, state her medications were helping. *Id.* (Tr. 433). She reported frequent urination and difficulty holding it, painful joints, and musculoskeletal weakness. *Id.* Upon examination, Plaintiff had thoracic tenderness, lumbosacral and costovertebral tenderness, and decreased ROM in the shoulders with pain and tenderness over the rotator cuff muscles bilaterally. (Tr. 434). She had normal motor strength and intact sensation. *Id.*

On January 30, 2014, Plaintiff was again seen by Dr. Lazzerini for complaints of back pain radiating to the left leg. (Tr. 430). She reported incontinence of the bladder at times. *Id.* Upon examination, Plaintiff reported tenderness to palpation of the lumbosacral spine with spasm,

4

guarding, and a limited ROM. (Tr. 431). She had normal motor strength and intact sensation. *Id*. Dr. Lazzerini referred Plaintiff for physical therapy and massage. *Id*.

On February 27, 2014, Plaintiff told Dr. Lazzerini she could not hold her urine at times. (Tr. 428). A physical examination showed tenderness in the back, normal motor strength, and intact sensation. (Tr. 429). Dr. Lazzerini added malaise and fatigue to Plaintiff's assessment. *Id*.

On March 27, 2014, Plaintiff followed up with Dr. Lazzerini complaining of continued back, neck and shoulder pain; she also expressed interest in smoking cessation. (Tr. 425). She rated her pain 10/10 and stated that it was excruciating and interfered with her daily activities. *Id*. Nonetheless, she said her medications helped her function. *Id*. She reported frequent urination. *Id*. Physical examination showed tenderness to palpation over the lumbosacral spine with severely limited ROM, spasm, and guarding. (Tr. 426). Plaintiff also had pain and decreased ROM in her shoulders. *Id*. She had normal motor strength and intact sensation. *Id*. Plaintiff was referred to physical therapy and a spinal surgery evaluation. *Id*.

On March 28, 2014, Plaintiff presented to the ER with complaints of nausea, vomiting, and diarrhea. (Tr. 356). A physical examination was unremarkable. *Id*. A CT scan of the abdomen showed no acute process. *Id*. She was assessed with acute pancreatitis. *Id*. She was discharged from the hospital on April 2, 2014. (Tr. 358).

On April 18, 2014, Plaintiff followed up with Dr. Lazzerini with complaints of fatigue and continued abdominal pain, as well as joint pain and musculoskeletal weakness. (Tr. 422). She requested a referral for a GI doctor. *Id*. Dr. Lazzerini ordered an abdominal ultrasound (Tr. 423).

On April 21, 2014, Plaintiff saw Phillip A. Immesoete, M.D., a neurosurgeon, with complaints of "serious back pain" and pain in her hips and legs, radiating to her toes. (Tr. 405).

She reported that the pain was so bad that she could barely get out of bed. *Id*. She also reported nausea, abdominal cramping, urinary incontinence, neck pain, arthritis, and numbness and tingling in her back and legs. (Tr. 406). A neurological examination yielded normal results. (Tr. 406-407). He ordered a CT scan of the spine. (Tr. 407).

On April 26, 2014, a CT scan of Plaintiff's lumbar spine showed "pars defects L5-S1 with grade I anterolisthesis. (Tr. 408). There was no stenosis at any level, but there was mild foraminal narrowing at L5-S1. (Tr. 409).

On April 28, 2014, Plaintiff followed up with Dr. Lazzerini reporting that morphine was not working, and that Percocet was "way better." (Tr. 419). Nonetheless, she continued reporting back and abdominal pain, which she rated 10/10. *Id*. She reported frequent urination at times, denied joint pain, but asserted weakness all over. *Id*. Upon examination, Plaintiff had tenderness to palpation of the lumbosacral spine, normal motor strength, and intact sensation. (Tr. 420). Dr. Lazzerini referred Plaintiff to Dr. Mir. *Id*.

Also, on April 28, 2014, Plaintiff followed up with Dr. Immesoete (Tr. 402). She reported numbness and tingling in her lower back and legs, as well as joint pain in her neck and back that radiated to her extremities. (Tr. 403). A neurological examination yielded normal results. *Id*. Dr. Immesoete noted that Plaintiff has several psychological issues and was not ready for surgery. (Tr. 404). Therefore, he recommended facet joint injections. *Id*.

On April 30, 2014, Plaintiff told Dr. Lazzerini that her pain was severe, but that Oxycodone was helping her function. (Tr. 417). She reported abdominal pain, frequent urination, painful joints, and musculoskeletal weakness. *Id*. Upon examination, Plaintiff had tenderness to palpation of the lumbosacral spine, normal motor strength, and intact sensation (Tr. 418).

On May 6, 2014, Plaintiff received facet joint injections. (Tr. 410).

On May 8, 2014, Plaintiff reported to Dr. Lazzerini that she had difficulty urinating, abdominal pain and painful joints. (Tr. 415). No complaints of back pain were noted. (Tr. 415-416). Later that month, on May 28, 2018, Plaintiff complained to Dr. Lazzerini of continued nausea and abdominal pain, and reported having been seen by a GI doctor, Dr. Neheer. (Tr. 491). Again, no complaints of back pain were noted, though she continued to complain of painful joints while denying any weakness. (Tr. 491-493). She denied any urination problems. (Tr. 492).

On June 2, 2014, Plaintiff returned to see Dr. Immesoete with complaints of lower back pain radiating to her hips and legs. (Tr. 542). She said her legs would "give out on her" causing falls. *Id*. She reported about three weeks of relief following her last facet joint injections. *Id*. She denied headaches and abdominal pain. *Id*. A neurological examination showed a normal gait and was unremarkable. (Tr. 543). Plaintiff requested another facet joint injection because she was going to be traveling to Florida. *Id*. Dr. Immesoete obliged and noted that Plaintiff "may be a good surgical candidate if injections fail." *Id*.

On June 10, 2014, July 20, 2014, and July 29, 2014, Plaintiff received additional facet joint injections. (Tr. 548-549, 566).

On June 18, 2014, Plaintiff reported to Dr. Lazzerini that the injections helped. (Tr. 494). Nonetheless, she complained of leg pain. *Id*. She denied any urination problems. (Tr. 495). A physical examination showed lumbosacral tenderness with limited ROM, normal motor strength, and intact sensation. *Id*. Dr. Lazzerini stated that Plaintiff was homebound and disabled due to her injuries. (Tr. 496).

On June 25, 2014, Plaintiff followed up with Dr. Immesoete. (Tr. 540). She reported relief with her last injection. *Id*. A neurological examination was normal, including muscle strength. (Tr. 540-541). He noted her positive response to injections and instructed her to contact

his office should her pain return. (Tr. 541). If she were interested, he believed she was an appropriate candidate. *Id*.

On July 18, 2014, Plaintiff saw Dr. Lazzerini with complaints of episodic paralysis, reporting excruciating and persistent pain. (Tr. 497). She reported loss of bladder control. (Tr. 498). Upon examination, Plaintiff had a severely decreased ROM in her spine due to pain. *Id*. Dr. Lazzerini recommended physical therapy three times a week for sixteen weeks. (Tr. 499).

On July 22, 2014, Dr. Immesoete noted Plaintiff's positive response to injections and reiterated his belief that she was an appropriate candidate for surgery if she were interested. (Tr. 539).

On February 13, 2015, Plaintiff saw Russ A. Mounts, PA-C, at the Crystal Clinic Orthopedic Center, for evaluation of her lower back pain (Tr. 626-629). She complained of numbness and tingling in her legs and feet, and cramping in her feet. (Tr. 626). She rated her pain as 4/10 currently, 8/10 at worst, and 2/10 at best. *Id*. She also complained of losing control of her bowl and bladder. *Id*. Upon examination, Plaintiff ambulated without difficulty, had balanced and upright posture, and a limited ROM in her lumbar spine with stiffness and pain on extension. (Tr. 628). She had full motor strength and negative straight leg raises. *Id*. She had deficient sensation over the L5 and S1 vertebrae. *Id*. X-rays showed lytic spondylolisthesis at L5-S1, and the remaining disc spaces appeared to be fairly normal. (Tr. 625).

On March 20, 2015, Plaintiff met with Douglas M. Ehrler, M.D., an orthopedic surgeon. (Tr. 631). She reported some improvement in symptoms with pain medication, rest, and activity modification. *Id*. She said the facet injections initially helped. *Id*. Dr. Ehrler assessed degenerative disc disease, spinal stenosis, and spondylolisthesis. (Tr. 618). Dr. Ehler's plan was

8

as follows:

> We discussed that the patient's MRI shows an Isthmic Spondylolisthesis at L5 and bil Foraminal Stenosis. The risks and benefits of all treatment options were discussed with the patient, including those of anti-inflammatories, physical therapy, Epidural injections and a Laminectomy and Fusion (L5). We discussed and the patient understands that the operative treatment is designed for the relief of symptoms in the legs and not for back pain. Due to its correlation with degenerative changes, the patient was advised to quit smoking and all the benefits of doing so were discussed. The patient was also advised that her MRI shows an enlarged liver and was told to follow up with PCP. At this time, the patient has a fear of "going under" and would like to proceed with the rest of conservative treatments. She will return to pain management for Epidural injections and will follow up with the clinic after the injections to discuss their effectiveness. We discussed non operative and operative treatment of their condition. At this time, we have decided to proceed with non operative treatment.

(Tr. 618-619).

On October 9, 2015, Plaintiff was seen by William Midian, M.D., for complaints of chronic low back pain, neck pain, and shoulder pain. (Tr. 584). She denied any bladder dysfunction. (Tr. 585). Dr. Midian observed that Plaintiff appeared to have bilateral pain across L5. *Id*. At the next visit, Dr. Midian prescribed Oxycodone. (Tr. 593).

On January 11, 2016, Plaintiff followed up with Dr. Ehrler. (Tr. 621). She complained of low back pain radiating bilaterally to the hips and legs, down to her feet. *Id*. Plaintiff reported weakness, falling the prior week, and aggravation of symptoms with bending, walking, sitting, standing and changing positions. *Id*. She denied any genitourinary issues. (Tr. 622). Physical examination showed decreased motor strength in her left lower extremity. (Tr. 623). Plaintiff decided to proceed with non-operative treatment and was referred to pain management for epidural injections. (Tr. 624).

On January 16, 2016, Plaintiff was seen by Dr. Midian, reporting severe low back pain that radiates into her facet joints. (Tr. 601). She stated her pain ranges between 4/10 and 8/10 with

Medication. *Id.*

On February 13, 2016, Plaintiff complained to Dr. Midian of chronic low back radicular pain. (Tr. 604). She stated it was difficult to move her arms. *Id.* Plaintiff requested stronger medications, but Dr. Midian declined until Plaintiff received facet joint injections. (Tr. 605).

On March 11, 2016, Plaintiff asked Dr. Midian about nerve blocks, which the physician indicated may be possible in the future. (Tr. 607). Dr. Midian advised Plaintiff to go back to school and maybe get some counseling to help her with esteem. *Id.* Her Oxycodone dosage was increased. (Tr. 608).

On April 8, 2016, Plaintiff reported to Dr. Midian that her pain was becoming "very exquisite." (Tr. 632). Dr. Midian observed that Plaintiff had reached therapeutic efficacy with her current medication regimen. (Tr. 634).

### 2. Medical Opinions Concerning Plaintiff's Functional Limitations

On May 14, 2014, State Agency physician William Bolz, M.D., reviewed the record and opined that Plaintiff could lift/carry twenty pounds occasionally and ten pounds frequently; stand/walk for six hours; and, sit for six hours in an eight-hour workday. (Tr. 85). Plaintiff could occasionally climb ramps/stairs and never climb ropes/ladders/scaffolds. (Tr. 86). He opined that Plaintiff had no manipulative, visual, communicative or environmental limitations. *Id.*

In an undated opinion, Dr. Lazzerini completed a summary impairment questionnaire. (Tr. 336-337, Exh. 2F). He listed Plaintiff's diagnoses as 722.6 (degeneration of intervertebral disc, site unspecified), 722.52 (degeneration of lumbar or lumbosacral intervertebral disc), 724.2 (lumbago) and indicated his notes support these diagnoses. (Tr. 336). He did not indicate whether Plaintiff's impairments would last at least 12 months. *Id.* He circled boxes indicating that Plaintiff could sit for less than 1 hour and stand/walk for less than 1 hour each in an 8-hour

day; and lift up to 5 pounds occasionally. (Tr. 337). He indicated that Plaintiff needed to elevate her legs to waist level while sitting; and she had significant limitations in reaching, handling, and fingering but the doctor left the more specific questions concerning manipulative restrictions incomplete. *Id*. Dr. Lazzerini checked a box indicating that Plaintiff would be absent more than three times a month due to her impairments, and that her symptoms and limitations dated back to December 6, 2013. (Tr. 337).

On August 20, 2014, Dr. Lazzerini completed a disability impairment questionnaire indicating that he first treated Plaintiff on July 17, 2013, and sees her every three to four weeks. (Tr. 574-578). He indicated Plaintiff's primary symptoms were severe low back pain, sciatica, and difficulty walking, which stemmed from neurologic pain in the lower back resulting in constant, unrelenting pain that was aggravated by walking. (Tr. 575). Aside from medications, Plaintiff had been treated with physical therapy. *Id*. Dr. Lazzerini opined that Plaintiff could sit and stand/walk for less than one hour each in an 8-hour day, lift but not carry up to 5 pounds occasionally. (Tr. 576). He stated that Plaintiff must get up from a seated position to move around every fifteen minutes, and needed ten minutes before returning to a seated position. *Id*. Plaintiff needed to elevate both legs six inches or less for thirty minutes eight to ten times per day. *Id*. He believed Plaintiff could occasionally grasp, handle/finger, and reach overhead bilaterally. (Tr. 577). He indicated Plaintiff's pain would frequently interfere with her attention and concentration, that she would require unscheduled breaks every two to three hours, and would be absent from work more than three times a month. (Tr. 577-578). He explained that Plaintiff had crippling pain in her lower back that was relentless and impaired her functioning and that her symptoms had persisted at the stated level since December 6, 2013. (Tr. 578).

On the same date, Dr. Lazzerini drafted a handwritten "narrative report," indicating he had

treated Plaintiff since July 17, 2013. (Tr. 582). He explained that x-rays showed multilevel degenerative disc disease and generalized osteoarthritis. *Id*. He diagnosed Plaintiff with 722.51 (degeneration of thoracic or thoracolumbar intervertebral disc), 715.80 (osteoarthrosis involving, or with mention of more than one site, but not specified as generalized, site unspecified), 722.52 (degeneration of lumbar or lumbosacral intervertebral disc), 724.2 (lumbago), and 724.3 (sciatica). *Id*. Dr. Lazzerini stated that Plaintiff had extreme pain in her joints and sciatica, and that she had been treated with morphine, Percocet, Diazepam, physical therapy, and epidural injections. *Id*. Her medications caused drowsiness and lack of coordination. (Tr. 583). He opined that Plaintiff was unable to walk long distances, had pain with standing and sitting, and would have a severely limited ability to function at work. *Id*. He believed Plaintiff's prognosis was poor and that her condition was lifelong and would improve little over time, resulting in limited functioning and chronic pain. *Id*.

On September 24, 2014, State Agency physician Leon D. Hughes, M.D., reviewed the evidence of record and assessed limitations that mirrored Dr. Bolz. (Tr. 112-114). He indicated that Dr. Lazzerini's opinion was not supported by the objective evidence given Plaintiff's normal strength, reflexes, and gait. (Tr. 112).

On April 4, 2016, Nicole D'Amico, PA-C with the Crystal Clinic Orthopedic Center, completed part of a questionnaire, indicating that Plaintiff had degenerative disc disease, spondylolisthesis at L5-S1, foraminal stenosis at L5-S1, and bilateral lower extremity radiculopathy. (Tr. 609). She indicated that Plaintiff had radiating pain associated with muscle weakness in her legs. (Tr. 610-611). She stated that bending, walking, sitting, standing and changing positions aggravated Plaintiff's pain. (Tr. 611). She indicated that Plaintiff's legs did not need to be elevated. (Tr. 613). She left blank those portions of the form that inquired about

Plaintiff's ability to ambulate and that requested an opinion on her work-related functional limitations. (Tr. 611-613).

On June 1, 2016, Plaintiff underwent a consultative examination performed by Michael Fisher, D.O. (Tr. 636-639). Plaintiff described her daily functioning to Dr. Fisher as follows: she can get around the house, bathe, prepare meals, she uses a walker, can sit for 15 minutes, and stand for 7 to 10 minutes, and lift/carry no more than 3 pounds. (Tr. 636-637). She reported that activity worsens the low back and shoulder pain. *Id*. She describes the pain as sharp and stabbing, 10/10 on the pain scale at its worst, but improved with rest and medication. *Id*. Dr. Fisher observed a normal gait, but an inability to bend and touch her toes. (Tr. 637). Manual muscle testing yielded largely normal results with no spam and no muscle atrophy. (Tr. 640-642). Dr. Fisher opined that Plaintiff had appropriate strength of bilateral upper and lower extremities, intact sensation, and would have no problem using her hands or upper extremities for any fine motor task that could be performed from a seated position. (Tr. 639). However, "[s]he would not be able to stand or sit in a specific position for any length of time," the latter requiring frequent breaks and position changes. *Id*. He opined she would be unable to "stand or ambulate any significant distance because of low back and bilateral leg pain." *Id*. She would also not be amenable to overhead tasks; was unable to squat, crawl, climb ladders or work from heights. *Id*.

**B. Relevant Hearing Testimony**

At the March 23, 2016 hearing, Plaintiff testified that she cannot sit in the car for long periods of time, which she defined as 20 to 30 minutes. (Tr. 51). She could stand for 7 to 10 minutes before needing to sit down, and walk 15 feet before needing to take a break. (Tr. 52). She could sit for 10 to 15 minutes before needing to stand. *Id*. She could lift less than five

pounds without experiencing pain. *Id*. She has fallen 5 or 6 times in the past year due to loss of sensation and numbness in her legs. (Tr. 57). She used to love cooking for her family, but "that's something I can't, but when I do, and I have to sit at the stove," she sits on a Rollator. (Tr. 51-52) She reported having no hobbies. (Tr. 60). She does not shower due to trouble standing and uses a tub instead. (Tr. 61). Her husband helps her with putting on her shoes, as well as with certain articles of clothing. (Tr. 65). She does not grocery shop, and does not perform any chores. (Tr. 61-62). She takes 3 to 4 naps per day. (Tr. 62). She spends about 30 minutes a day sitting in a recliner with her feet elevated. (Tr. 62). She spends most of her day lying down to relieve her pain, even when she is awake. (Tr. 62-63). During an 8-hour period, she spends 7 to 8 hours lying down. *Id*.

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6ᵗʰ Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

The Commissioner determines whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6ᵗʰ Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a medically determinable "severe impairment" or

combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s) does not prevent her from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent her from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

### IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act (the "Act") through September 30, 2019.

2. The claimant has not engaged in substantial gainful activity since December 6, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: lumbar degenerative disc disease with stenosis, spondylolisthesis and pars defect [hereinafter, the "lumbar impairment"], cervical degenerative disc disease, anxiety and depression (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that the claimant must be afforded the ability to alternate occasionally between the sitting and standing positions; the claimant may occasionally balance, stoop, kneel, crouch, occasionally crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; the claimant may occasionally reach overhead with the bilateral upper extremities, but may frequently reach in all other directions with the bilateral upper extremities; the claimant must avoid concentrated exposure to workplace hazards; the claimant is limited to unskilled work, consisting of simple, routine, repetitive tasks, undertaken in a work setting that is static, in that it contemplates imposition of few, if any, work-related changes, which setting is free of strict time limitations or strict high production quotas, which setting requires no more than frequent interaction with others.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on ***, 1969 and was 44 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 6, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 23-35).

## V. Law and Analysis

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. (*Id.*) However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B. Plaintiff's Assignments of Error

#### 1. Weight Ascribed to Dr. Lazzerini

In the first assignment of error, Plaintiff asserts that the ALJ erred by violating the treating physician rule with respect to the weight assigned to her treating physician—Dr. Lazzerini.[2] (R.

---

[2] Plaintiff also appears to argue that the ALJ violated the treating physician rule with respect to two consultative opinions—Drs. Fisher and Perry. (R. 15, PageID# 750-751). Plaintiff fails to

15, PageID# 748-752). The Commissioner does not challenge that Dr. Lazzerini was a treating source pursuant to the regulations, but counters that the ALJ properly considered the doctor's opinions. (R. 16, PageID# 774).

"Provided that they are based on sufficient medical data, 'the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference.'" *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002) (quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985)). In other words, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ does not give a treating source's opinion controlling weight, then the ALJ must give good reasons for doing so that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *See Wilson*, 378 F.3d at 544 (*quoting* Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5). The "clear elaboration

_____

acknowledge that the treating source rule is inapplicable to consultative examiners and offers no meaningful argument as to how the ALJ's consideration of their opinions violated any rule or regulation other than the conclusory allegation that the ALJ was playing doctor or cherry-picking the evidence. (R. 15, PageID# 750-752). The Sixth Circuit has found that a claimant's allegation of cherry-picking evidence by an ALJ unavailing on appeal, agreeing with the court below that such an "allegation is seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. Apr. 3, 2014) (*citing White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) (finding "little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence.")); *accord Hammett v. Comm'r of Soc. Sec.*, No. 16-12304, 2017 WL 4003438, at *3 (E.D. Mich. Sept. 12, 2017); *Cromer v. Berryhill*, No. CV 16-180-DLB, 2017 WL 1706418, at *8 (E.D. Ky. May 2, 2017); *Anderson v. Berryhill*, No. 1:16CV01086, 2017 WL 1326437, at *13 (N.D. Ohio Mar. 2, 2017), *report and recommendation adopted*, 2017 WL 1304485 (N.D. Ohio Apr. 3, 2017).

requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is "in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that [her] physician has deemed [her] disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson*, 378 F.3d at 544 (*quoting Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)); *see also Johnson v. Comm'r of Soc. Sec.*, 193 F. Supp. 3d 836, 846 (N.D. Ohio 2016) ("The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.") (Polster, J.)

It is well-established that administrative law judges may not make medical judgments. *See Meece v. Barnhart*, 192 Fed. App'x 456, 465 (6th Cir. 2006) ("But judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.") (*quoting Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990)). Although an ALJ may not substitute his or her opinions for that of a physician, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009). If fully explained with appropriate citations to the record, a good reason for discounting a treating physician's opinion is a finding that it is "unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence." *Conner v. Comm'r of Soc. Sec.*, 658 Fed. App'x 248, 253-254 (6th Cir. 2016) (*citing Morr v. Comm'r of Soc. Sec.*, 616 Fed. App'x 210, 211 (6th Cir. 2015)); *see also Keeler v. Comm'r of Soc. Sec.*, 511 Fed. App'x 472, 473 (6th Cir. 2013) (holding that an ALJ properly discounted the subjective evidence contained in a treating physician's opinion because it too heavily relied on

the patient's complaints).

After setting forth the content of Dr. Lazzerini's opinions, the ALJ addressed these disputed

opinions as follows:

> The claimant's former family practitioner, Dr. Lazzerini, offered three opinions of
> function. The first, is not entitled to controlling weight. The statement is undated,
> and registered as exhibit file (2F), did not certify that the limitations were
> intended to last twelve months, is accordingly not, by definition, addressed to a
> severe impairment, and so it is entitled to little weight. *** Again, none of these
> three statements are entitled to controlling weight. Dr. Lazzerini has treated the
> claimant over a lengthy period and was reporting within the bounds of his
> professional certifications. Moreover, in identifying the claimant's back
> impairment as limiting her work capacity, his opinions are broadly consistent
> with the evidence. However, as to the severity of the restrictions that would
> appertain, his opinion is not consistent with the overall evidence of record, as
> discussed in digest form in the analysis of Dr. Fischer, above. His opinion
> regarding the claimant's ability to sit or stand would leave the claimant effectively
> bedridden, a condition of which even she does not admit (hearing testimony). The
> restrictions as suggested by Dr. Lazzerini are not consistent with his own
> treatment notes, which intermittently report lumbar spasms and reduced range of
> motion, more often report tenderness to palpation, but always reports a non-focal
> neurological examination, with intact sensation and normal motor strength,
> globally (6F/6, 8, 10, 13, 19, 24, 27, 29, 31), (8F/32, 35). Because the restrictions
> as suggested are not consistent with the overall record, or with his own treatment
> notes, no controlling weight, but rather partial weight was accorded these
> opinions.

(Tr. 32).

As recounted above, Dr. Lazzerini opined, in material part, that Plaintiff could sit for less

than an hour, stand/walk for less than one hour, and lift (but not carry) 5 pounds occasionally in

an 8-hour workday. (Tr. 576). He also opined that Plaintiff needed to elevate both legs six inches

or less for thirty minutes eight to ten times per day, that Plaintiff would require unscheduled

breaks every two to three hours, and that Plaintiff would be absent from work more than three

times a month. (Tr. 577-578). While ostensibly ascribing partial weight to Dr. Lazzerini's

opinions, the ALJ plainly rejected these enumerated opinions as they are inconsistent with both

the RFC and are generally work preclusive. The question is whether the ALJ gave good reasons for rejecting Dr. Lazzerini's opinions.

First, the ALJ's reference to the decision's discussion of Dr. Fisher's opinion is unclear. The ALJ's assertion—that Dr. Lazzerini's opinion is not consistent with the overall evidence of record—is not mentioned at all in the discussion of Dr. Fisher. (Tr. 31). Moreover, the ALJ's discussion concerning Dr. Fisher's opinion revolves around the issue of the failure of Dr. Fisher to employ readily definable vocational terms. *Id*. The two opinions differ significantly in both form and substance, thus the reasons for discounting Dr. Fisher's opinion are not readily transferable to Dr. Lazzerini. Furthermore, as the opinion of a consultative examiner, Dr. Fisher's opinion is not subject to the benefit of the treating physician rule, but Dr. Lazzerini's opinion is reviewed pursuant to that standard.

Second, the ALJ observes that Dr. Lazzerini's opinion would leave the claimant effectively bedridden. While Dr. Lazzerini's assessed limitations are indeed extremely limiting, that alone does not furnish a sufficient basis for rejecting it. Though the ALJ characterizes the standing/walking and sitting limitations as even greater than those self-reported by Plaintiff in her hearing testimony, he does not offer any further explanation. Though earlier in the decision the ALJ mentions Plaintiff's ability to groom herself, take short drives, and prepare simple meals, it is unclear that any of these activities would exceed either an hour of standing or sitting.[3]

_____

[3] It bears noting that the ability to perform sedentary work, as found by the ALJ, requires the ability to sit for six hours and stand/walk for two hours in an eight-hour workday. Social Security Ruling ("SSR") 83-10, 1983 WL 31251 (S.S.A. 1983) ("Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday.") Thus, a marginally greater ability to sit or stand/walk than assessed by Dr. Lazzerini would still leave Plaintiff incapable of even sedentary work and, thus, unemployable.

Finally, the ALJ concludes that the restrictions assessed by Dr. Lazzerini are inconsistent with the overall record and/or his own treatment notes. This conclusion, however, is supported only by the observation that Dr. Lazzerini's notes always report a non-focal neurological examination with intact sensation and normal motor strength. (Tr. 35). The ALJ's reasoning appears to be based on the assumption that a person who can only stand/walk or sit for one hour each in an eight-hour workday must experience some abnormality with sensation and/or muscle strength. Although such an assumption may be reasonable to a lay person and might ultimately be correct, the ALJ lacks the medical expertise to make such an assumption. Dr. Lazzerini's assessment appears to be based primarily on the levels of pain experienced by Plaintiff, which stem from the back but radiate into the extremities. Neither the court nor the ALJ can reasonably speculate whether such radicular pain would necessarily affect sensation or motor strength. The ALJ's finding essentially constitutes the ALJ's own lay interpretation of the medical data of record. ALJ's are not trained medical experts and it is well-established that they may not substitute their own opinion for that of a medical professional. *See, e.g., Meece v. Barnhart*, 192 Fed. Appx. 456, 465 (6ᵗʰ Cir. 2006) ("[T]he ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence.") (*citing McCain v. Dir., Office of Workers' Comp. Programs*, 58 Fed. App'x 184, 193 (6ᵗʰ Cir. 2003) (citation omitted); *Pietrunti v. Director, Office of Workers' Comp. Programs, United States DOL*, 119 F.3d 1035, 1044 (2nd Cir. 1997); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("But judges, including [ALJs] of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.")); *accord Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 823-24 (N.D. Ohio 2009) ("Although the ALJ is charged with making credibility determinations, an ALJ 'does not have the expertise to

make medical judgments.'"); *Stallworth v. Astrue*, 2009 U.S. Dist. LEXIS 131119, 2009 WL 2271336 at *9 (S.D. Ohio, Feb. 10, 2009) ("[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other evidence or authority in the record.")(*quoting Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)).

While the record might contain a myriad of good reasons for rejecting Dr. Lazzerini's opinions, the ALJ has not sufficiently identified them. This court's role in considering a social security appeal, however, does not include reviewing the evidence *de novo*, making credibility determinations, or reweighing the evidence. *Brainard*, 889 F.2d at 681; *see also Stief v. Comm'r of Soc. Sec.*, No. 16-11923, 2017 WL 4973225, at *11 (E.D. Mich. May 23, 2017) ("Arguments which in actuality require 're-weigh[ing] record evidence' beseech district courts to perform a forbidden ritual."), *report and recommendation adopted*, 2017 WL 3976617 (E.D. Mich. Sept. 11, 2017). As such, it would be improper for this court to decide the appropriate weight to ascribe to Dr. Lazzerini's opinions. "[A court] cannot uphold a decision by an administrative agency ... if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). The court is unable to meaningfully trace the path of the ALJ's reasoning. Because the ALJ did not provide sufficiently specific reasons for rejecting Dr. Lazzerini's opinions, Plaintiff's argument that the ALJ violated the treating physician rule is well-taken. Though the ALJ certainly was not required to credit Dr. Lazzerini's opinions, the proffered reasons for discounting the opinions are insufficient to constitute good reasons without a more meaningful analysis.

### 2. Credibility Analysis and the RFC

Plaintiff raises two additional arguments in support of remand. However, as the court has

already determined that a remand is necessary based on Plaintiff's first assignment of error, the court declines to address Plaintiff's remaining arguments in the interests of judicial economy.

## IV. Conclusion

For the foregoing reasons, the Commissioner's final decision is REVERSED and REMANDED for proceedings consistent with this opinion.

IT IS SO ORDERED.

s/ *David A. Ruiz*
David A. Ruiz
United States Magistrate Judge

Date: March 25, 2019